**ELF ATOCHEM NORTH AMERICA, INC., Plaintiff,**

v.

**LaROCHE INDUSTRIES, INC., Defendant.**

**No. Civ.A. 99–391–RRM.**

United States District Court,
D. Delaware.

Feb. 22, 2000.

Jack B. Blumenfeld, Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Mari M. Shaw, David W. Cromley, Robert L. Ebby, Morgan, Lewis & Bockius LLP, Philadelphia, PA, Michael P. Tierney, Morgan, Lewis & Bockius LLP, Washington, DC, for plaintiff.

Philip A. Rovner, Potter Anderson & Corroon LLP, Wilmington, DE, Michael O'Shea, Christopher Serbagi, Clifford Chance Rogers & Wells LLP, Washington, DC, for defendant.

## OPINION

McKELVIE, District Judge.

This is a patent case. Plaintiff Elf Atochem North America, Inc. is the North American subsidiary of Elf Atochem, a French corporation. Plaintiff ("Elf Atochem") is a Pennsylvania corporation with its principal place of business in Philadelphia. Elf Atochem is the assignee of U.S. Patent No. 4,948,479 ("the '479 patent"), which claims a process for separating the chemical 1,1–dichloro–1–fluoroethane ("HCFC–141b") from contaminants produced in the manufacturing process. Defendant LaRoche Industries Inc. is a Delaware corporation with its principal place of business in Atlanta.

On June 21, 1999, Elf Atochem filed a complaint against LaRoche for patent infringement. The case is scheduled for a two-week jury trial beginning May 15, 2000.

On November 26, 1999, Elf Atochem filed a motion for preliminary injunctive relief, seeking a court order restraining and enjoining LaRoche from infringing the '479 patent. Elf Atochem alleges that LaRoche is insolvent and is actively considering filing for bankruptcy protection. Elf Atochem asserts that if LaRoche files for bankruptcy, then the automatic stay provisions of the Bankruptcy Code will threaten Elf Atochem's ability to obtain a permanent injunction. Elf Atochem also contends that this court should order preliminary injunctive relief because La-Roche's financial state will prevent it from paying for continuing damages; because LaRoche is undercutting Elf Atochem in the marketplace and depressing prices; and because the market for HCFC–141b will shortly disappear pursuant to the Clean Air Act, which will prohibit the sale of HCFC–141b starting in January 1, 2003.

On January 5, 2000, the court held a preliminary injunction hearing. This is the court's decision on Elf Atochem's motion for preliminary injunctive relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The court draws the following facts from the complaint, the answer, and the evidence that was presented during the January 5, 2000 preliminary injunction hearing.

### A. The Parties

Elf Atochem is a leading manufacturer and supplier of HCFC–141b. It began selling the compound in or about 1992. Elf Atochem was previously known as Pennwalt Corporation. LaRoche is a rival producer of HCFC–141b. LaRoche began producing the compound in or about 1993. There are a number of other producers of HCFC–141b, including Allied Signal.

### B. The Technology

#### 1. Production of HCFC–141b

Chlorofluorocarbons (CFCs) are chemical compounds that are thought to deplete stratospheric ozone. In 1987, the United States signed the Montreal Protocol, which is an international agreement to ban the use of CFCs. In the late 1980s and early 1990s, chemical manufacturers began producing alternatives to CFCs that would be less destructive to the ozone layer. One such compound is HCFC–141b. Use of HCFC–141b is permitted by federal law on an interim basis. Guidelines promulgated under the Clean Air Act will prohibit the use of HCFC–141b after January 1, 2003. See 40 C.F.R. § 82.4.

338

HCFC–141b is produced by reacting 1,1,1–trichloroethane with hydrogen fluoride. The reaction produces a number of contaminants, including vinylidene chloride (VDC) and other compounds with a carbon-carbon double bond. The reaction can be represented as such:

$$\text{1,1,1-trichloroethane} \xrightarrow{\text{HF}} \text{1,1-dichloro-1-fluoroethane (HCFC-141b)} + \text{Vinylidene chloride (VDC)}$$

One challenge faced in the production of HCFC–141b is to separate the HCFC–141b produced in the above reaction from the impurities, such as VDC. VDC and HCFC–141b have similar boiling points (37°C and 32°C, respectively), so separation techniques such as distillation are impractical for purifying HCFC–141b. It is especially important to separate HCFC–141b from VDC, because VDC is a suspected carcinogen that is toxic when inhaled.

## 2.  The photochlorination reaction

To separate HCFC–141b and VDC, the technique claimed by the '479 patent involves treating the impure HCFC–141b mixture with chlorine in the presence of light. This process is called "photochlorination." The success of this technique depends on being able to selectively chlorinate the VDC without chlorinating the HCFC–141b. The selective photochlorination reaction can be represented as:

$$\text{1,1-dichloro-1-fluoroethane (HCFC-141b)} + \text{Vinylidene chloride (VDC)} \xrightarrow[\text{light}]{Cl_2} \text{HCFC-141b (unreacted)} + \text{1,1,1,2-tetrachloroethane}$$

It is thought that the chlorine selectively reacts with VDC in the above reaction, and not with HCFC–141b, because of the presence of the carbon-carbon double bond in the VDC. Compounds with a carbon-carbon double bond are termed "unsaturated." Compounds with a carbon-carbon single bond are termed "saturated." In unsaturated compounds, the two bonds of the carbon-carbon double bond are not equivalent. The second of the two bonds is weaker, and hence more reactive. When the chlorine is reacted with the mixture of HCFC–141b and VDC, it reacts primarily at the site of the double bond in VDC. A small, but insignificant amount of HCFC–141b reacts with chlorine, and is "consumed." It is said that the "reaction rate" of VDC with chlorine is greater than the reaction rate of HCFC–141b with chlorine. These rates are quantifiable, and will be discussed in detail below.

The chlorination reaction will not proceed without an initiator. The initiator serves to destabilize the bond between the two chlorine atoms, and to render the chlorine susceptible to reaction. Ultraviolet radiation is one such initiator.

When the photochlorination reaction is carried out, the VDC reacts with the chlorine to produce 1,1,1,2–tetrachloroethane, which boils at 131°C. The 1,1,1,2–tetrachloroethane has a significantly higher boiling point than HCFC–141b, and so the HCFC–141b can be distilled off in a relatively pure state after the photochlorination reaction.

### 3. *The halogen elements*

Halogens are the elements in the column labeled Group 7A of the Periodic Table of the Elements. They are fluorine (F), chlorine (Cl), bromine (Br), and iodine (I). Elements in the same group of the Periodic Table generally have similar chemical properties. "Halogenation" of carbon compounds refers to the process of reacting halogen atoms or molecules with carbon compounds. Chlorination is a specific halogenation process which involves the reaction of a chemical compound with chlorine atoms or molecules.

### 4. *Reaction rates*

The rate of chemical reactions can be quantified. There are two reactions involved in the present case whose relative rates bear on the feasibility of the claimed invention. The first is the chlorination of VDC:

$$\underset{\text{Vinylidene chloride (VDC)}}{\overset{H}{\underset{H}{C}}=\overset{Cl}{\underset{Cl}{C}}} \xrightarrow[\text{light}]{Cl_2} \underset{\text{1,1,1,2-tetrachloroethane}}{H-\overset{H}{\underset{Cl}{C}}-\overset{Cl}{\underset{Cl}{C}}-Cl}$$

The rate of the VDC chlorination reaction is represented by the symbol $k_{VDC}$. Experimentally, it has been found that $k_{VDC}$ has a value of approximately $5 \times 10^{10}$ L/mol-sec. This value has been published in the scientific literature since 1972.

The second reaction at issue in this case is the undesired reaction whereby the target product, HCFC–141b, is "consumed" by the chlorination reaction:

$$\underset{\text{1,1-dichloro-1-fluoroethane (HCFC-141b)}}{H-\overset{H}{\underset{H}{C}}-\overset{Cl}{\underset{Cl}{C}}-F} \xrightarrow[\text{light}]{Cl_2} \begin{array}{l}\text{Chlorination Products}\\\text{(HCFC-141b consumed)}\end{array}$$

Commercial interest in HCFC–141b is relatively recent, and so the rate of reaction of this compound with chlorine ($k_{HCFC-141b}$) was not published prior to the time the '479 patent was filed.

The key to the success of the claimed invention is that the rate of chlorination of VDC ($k_{VDC}$) be much greater than the rate of chlorination of HCFC–141b ($k_{HCFC-141b}$), so that little of the HCFC–141b becomes "consumed" by the chlorine. When the VDC chlorination reaction proceeds much faster than the latter, the chlorination reaction is said to be "selective" for VDC. As of 1989, published data did not disclose whether, and to what extent, the VDC chlorination reaction is faster than the HCFC–141b reaction.

### C. *The Patent*

Wayne Brooks is a named inventor of the '479 patent. In 1987, he was the production superintendent of Elf Atochem's plant in Calvert City, Kentucky. Brooks sought to develop a process to manufacture HCFC–141b profitably. William L. Baggett, the other named inventor of the patent, was a process chemist at the same plant. One day, on a walk, the two discussed the HCFC–141b project, and particularly the problem of separating HCFC–141b from unsaturated contaminants, such as VDC. Brooks' idea was to use photochlorination to convert the unsaturated impurities at so selective a rate that

very little HCFC–141b would be consumed in the process.

Daniel Monaco is a patent attorney at the law firm of Seidel, Gonda, Lavorgna & Monaco in Philadelphia. In 1989, he submitted a patent application to the U.S. Patent and Trademark Office (PTO) based upon the above invention. Later that year, the PTO examiner rejected the proposed claims as unpatentable under 35 U.S.C. § 103 in light of a number of prior art references including U.S. Patent No. 3,629,085, issued to Coppens ("the Coppens '085 patent"). In the words of the examiner,

> Coppens discloses separating trichloroethylene from 1,2–dichloroethane in a mixture by irradiating the mixture with UV light in the presence of chlorine to chlorinate trichloroethylene into a compound which has a boiling point substantially different from the dichloroethane so that the two compounds can be separated by distillation.

Monaco responded to the rejection on December 13, 1989 by asserting that the prior art does not disclose that the chlorination reaction would work with HCFC–141b. He noted that unsaturated, target compounds, such as HCFC–141b are inadvertently consumed in chlorination reactions, and he asserted that it is cannot be predicted whether a given unsaturated compound will be consumed. According to Monaco, "[i]t is only by actual experimentation that one can satisfactorily demonstrate that a given hydrocarbon may be successfully purified." Experimental data shown in the specification of the patent application, Monaco stated, show that the photochlorination reaction is selective for unsaturated compounds (such as VDC). He described this as an unexpected discovery that could not be predicted based upon the prior art.

On February 26, 1990, the examiner allowed the claims. He stated that the prior art does not specifically disclose a photochlorination process for separating HCFC–141b from unsaturated contaminants. The examiner referred to the applicants' experimental results as a basis for his ruling.

The '479 patent was issued on August 14, 1990. The patent has 13 claims. Claims 1 and 11 are independent claims, with Claims 2–10 depending from Claim 1, and Claims 12 and 13 depending from Claim 11. Claim 1 recites:

> 1. A process for removing unsaturated carbon compounds from 1,1–dichloro–1–fluoroethane comprising:
>
> treating a liquid mixture comprising 1,1–dichloro–1–fluoroethane and at least one unsaturated carbon compound with chlorine;
>
> irradiating said chlorine-treated liquid mixture with ultraviolet light to selectively convert at least a portion of the unsaturated carbon compounds in the mixture to photochlorination products thereof no or small consumption of 1,1– dichloro–1–fluoroethane; and
>
> separating 1,1–dichloro–1–fluoroethane from said photochlorination products.

Elf Atochem has asserted Claims 1, 2, 3, 6, 7, and 10 against LaRoche.[1]

1. The dependent claims of the '479 patent that Elf Atochem asserts against LaRoche read as follows:

2. A process according to claim 1 wherein the step of separating 1,1–dichloro–1–fluoroethane from the photochlorination products comprises distilling 1,1–dichloro–1–fluoroethane from the liquid mixture.

3. A process according to claim 2 wherein the mixture subject to treatment contains at least one halohydrocarbon compound having a lower boiling point than 1,1–dichloro–1–fluorethane, and at least a portion of said lower boiling point compound is separated from the liquid mixture prior to chlorine treatment.

6. A process according to claim 2 wherein the liquid mixture is treated with from about 1 to about 3 moles of molecular chlorine per mole of unsaturated carbon compound contained in the mixture.

7. A process according to claim 6 wherein the liquid mixture is treated with from about 1 to about 1.5 moles of molecular chlorine per mole of unsaturated carbon compound contained in the mixture.

### D. *LaRoche's Production of HCFC–141b*

In or about 1993, Elf Atochem learned that LaRoche was constructing a plant to manufacture HCFC–141b in Gramercy, Louisiana. Elf Atochem contends that it had no way to review LaRoche's manufacturing process to determine whether LaRoche was practicing the '479 patent. Accordingly, on February 16, 1993, Elf Atochem wrote to LaRoche, enclosing a copy of the '479 patent, and asking LaRoche to review its processes in light of the patent. LaRoche responded in a letter on April 30, 1993, stating that the patent does not raise infringement liability issues.

The dispute between Elf Atochem and LaRoche grew in 1998. In April 1998, Elf Atochem received an anonymous typed note stating:

> LaRoche is cleaning up 141b by photochlorination in violation of your patent. The fluorocarbon business is for sale. It is your chance to look at the plant and find 2 photochlorination units.
>
> LaRoche is deeply in debt and cannot afford a lawsuit.
>
> You can get the business real cheap.

The next month, the PTO issued a patent to LaRoche that allegedly represents an improvement over the '479 patent. The patent, U.S. Patent No. 5,750,010 (the '010 patent), which is assigned to LaRoche, is entitled "Process for Photochlorination." It claims a process for separating HCFC–141b from unsaturated impurities by using photochlorination. According to Elf Atochem, one cannot practice the improvement claimed in the '010 patent without also practicing the fundamental technology claimed in the '479 patent. In a series of letters between Elf Atochem and LaRoche between August and October 1998, Elf Atochem inquired as to whether LaRoche was practicing the technology claimed by the '010 patent. LaRoche responded by informing Elf Atochem that its patent

counsel had further analyzed the '479 patent, and had determined that its claims are invalid.

### E. *The Lawsuit*

On June 21, 1999, Elf Atochem filed a complaint in this court against LaRoche. Elf Atochem asserts that LaRoche has infringed, and continues to infringe, claims of the '479 patent. Elf Atochem contends, moreover, that the infringement is knowing and willful. Elf Atochem seeks: (1) a judgment that LaRoche has willfully infringed and continues to infringe the patent claims; (2) a permanent injunction enjoining LaRoche from infringing the patent claims; (3) judgment against LaRoche for damages, including treble damages; and (4) a judgment that this case is exceptional.

On September 8, LaRoche filed its answer and counterclaim. LaRoche denies that it infringes any claims of the '479 patent. It also asserts the affirmative defenses that the '479 patent is invalid under 35 U.S.C. §§ 102, 103, and 112, and that Elf Atochem's claim for relief is barred by the doctrines of laches and estoppel. Under its counterclaim, LaRoche seeks a declaratory judgment that the claims of the '497 patent are invalid and not infringed by LaRoche. LaRoche amended its answer and counterclaim on September 24, adding the affirmative defense of inequitable conduct, and seeking a declaratory judgment that the '479 patent is unenforceable. LaRoche has demanded a jury trial.

### F. *Motion for Preliminary Injunction*

Elf Atochem moved at the outset of this litigation to begin discovery immediately to prepare a motion for a preliminary injunction. Elf Atochem alleged that LaRoche is in financial difficulty, and would not be able to compensate Elf Atochem for continuing damages, should liability be found.

10. A process according to claim 2 wherein the unsaturated carbon compounds removed

from the liquid mixture subject to treatment include vinylidene chloride.

On September 30, the court issued a scheduling order, and set a January 5, 2000 date for a preliminary injunction hearing.

According to the 10–K statement filed by LaRoche with the Securities and Exchange Commission (SEC) for the fiscal year ending February 28, 1999, LaRoche had a negative net worth of $10.6 million and had lost $41.1 million in fiscal year 1999. The filing discloses that LaRoche was not in compliance with certain financial covenants contained in its bank credit facility. As a result, the lender had reduced the amount of funds that LaRoche could borrow from $125 to $110 million. In addition, because earnings were insufficient to meet certain fixed charge ratios, limitations on borrowing and investments are also in effect under LaRoche's senior subordinated notes.

On July 15, 1999, LaRoche filed its Form 10–Q Quarterly Report with the SEC for the quarter ending May 31, 1999. The report showed that LaRoche had lost over $1.4 million in the previous quarter and had a negative net worth of over $12 million. On October 15, 1999, LaRoche filed its Form 10–Q Quarterly Report for the quarter ending August 31, 1999, disclosing that LaRoche had lost nearly $14.5 million in the previous quarter and now had a negative net worth of nearly $27 million. The report also discloses that amounts available under its credit facility would "not likely be adequate to meet the Company's cash needs." The report indicated, moreover, that LaRoche will not be profitable, at least domestically, over the next year.

In a deposition, LaRoche's Corporate Controller admitted that one of the alternatives LaRoche has been exploring is filing a petition for relief under chapter 11 of the United States Bankruptcy Code. The Controller further stated that "as it stands today, on December 10th we will not have adequate funds. We did not have adequate funds to fund operations."

In light of LaRoche's financial difficulties, on November 26, 1999, Elf Atochem moved for temporary and preliminary injunctive relief. Elf Atochem argues that, should LaRoche file for bankruptcy, the automatic stay provision of the Bankruptcy Code threatens Elf Atochem's ability to enjoin LaRoche from producing HCFC–141b. Elf Atochem argues, moreover, that LaRoche's insolvency renders it unable to pay a judgment against it for the continuing damages Elf Atochem is suffering. Elf Atochem further asserts that LaRoche has undercut Elf Atochem in the marketplace and continues to erode the market price for HCFC–141b. And, Elf Atochem contends that it will suffer irreparable harm if LaRoche is not immediately enjoined from producing HCFC–141b, because the market for this product will expire as of January 1, 2003 under the Clean Air Act. See 40 C.F.R. § 82.4.

On December 9, 1999, the parties stipulated, and the court so ordered, that in the event a petition for reorganization under chapter 11 of the Bankruptcy Code is filed by or against LaRoche, LaRoche will not oppose a request by Elf Atochem for relief from the automatic stay. Elf Atochem agreed to withdraw without prejudice that portion of its motion seeking a temporary restraining order.

G. *The Preliminary Injunction Hearing*

On January 5, 2000, the court held a preliminary injunction hearing. Elf Atochem presented the testimony of Tom Gelrich, who served as the Strategic Planning Manager for Elf Atochem from 1997 to 1999. Gelrich testified to the economic harm allegedly caused to Elf Atochem by LaRoche's sale of HCFC–141b. Elf Atochem next called Thomas Kenny, a financial analyst, who rendered his opinion that LaRoche is insolvent. And, Elf Atochem called William Dolbier, who holds a Ph.D. in organic chemistry and is a professor at the University of Florida. Dolbier gave

his opinion that the '479 patent is not invalid for obviousness.

LaRoche called William Pryor, who holds a Ph.D. in chemistry, and who is a professor at Louisiana State University. Pryor gave his opinion that the '479 patent is invalid for obviousness.

## II. DISCUSSION

### A. Legal Standards

■ To prevail on its motion for a preliminary injunction, Elf Atochem has the burden of showing: (1) that it has a reasonable likelihood of success on the merits; (2) that it will incur irreparable harm if the injunction were not granted; (3) that the balance of relative hardships tips in its favor; and (4) that the grant of an injunction would favor the public interest. *Bell & Howell Document Management Products Co. v. Altek Systems*, 132 F.3d 701, 705 (Fed.Cir.1997). Elf Atochem must demonstrate that it is likely to succeed on all disputed issues at trial. *New England Braiding Co., Inc. v. A.W. Chesterton Co.*, 970 F.2d 878, 882 (Fed.Cir. 1992).

■ Among its affirmative defenses, LaRoche asserts that the '479 patent is invalid for obviousness. 35 U.S.C. § 103. Patents are presumed valid. *Canon Computer Systems, Inc. v. Nu–Kote Inc.*, 134 F.3d 1085, 1088 (Fed.Cir.1998). In a trial on the merits, LaRoche would have to overcome the presumption of validity and demonstrate by clear and convincing evidence that the patent is invalid for obviousness. *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1480 (Fed.Cir.1998). A claimed invention is unpatentable if the differences between the subject matter and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Two or more prior art references may be combined to demonstrate obviousness, but the prior art must provide a suggestion or motivation to combine the references. *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1355 (Fed.Cir.1999). LaRoche must show that the references, taken as a whole, would have suggested Elf Atochem's invention to one of ordinary skill in the chemical arts at the time the invention was made. *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed.Cir.1986). Obviousness does not require absolute predictability. *Id.* In a trial on the merits, LaRoche would need to show that the prior art would give a person of ordinary skill in the art a "reasonable expectation" that the claimed process would work. *Id.*

■ In the context of a motion for a preliminary injunction, the burden shifts to the movant. The court will not grant Elf Atochem's motion for a preliminary injunction if LaRoche raises a "substantial question" concerning validity, enforceability, or infringement. *Genentech, Inc. v. Novo Nordisk*, 108 F.3d 1361, 1364 (Fed.Cir. 1997). To prevail, Elf Atochem must show that LaRoche's claim of invalidity "lacks substantial merit." *Id.*

### B. Obviousness

LaRoche contends that the '479 patent is invalid for obviousness. LaRoche asserts that the claimed process would have been obvious at the time of invention in light of the general knowledge in the art and four prior art references: 1) Great Britain Patent No. 627,773 (the "Chapman '773 patent"), issued to James Chapman in 1949; 2) U.S. Patent Nol. 3,629,085 (the "Coppens '085 patent"), issued to Guillaume Coppens in 1971; 3) U.S. Patent No. 2,894,044 (the "Prill '044 patent"), issued to Erhard Prill in 1959; and 4) an internal memorandum from Elf Atochem's predecessor corporation written by J.A. Conover (the "Conover memorandum") in 1980. At the January 5, 2000 preliminary injunction hearing, LaRoche presented the expert testimony of William Pryor, who rendered his opinion that, in light of these references and other generally known principles of chemistry, the invention disclosed

by the '479 patent would have been obvious to one of ordinary skill in the art in June 1989, the date the patent was filed.

### 1. *General Knowledge in the Art*

#### a. *LaRoche's position*

LaRoche asserts that by 1989, people of ordinary skill in the art would have predicted that HCFC–141b could be separated from unsaturated contaminants using photochlorination. LaRoche contends that in 1989, photochlorination followed by distillation was a known means for separating unsaturated impurities from saturated carbon compounds. LaRoche notes that the patent examiner originally denied the application, and only allowed the patent in response to Elf Atochem's representations that it was unpredictable that the photochlorination reaction would work with HCFC–141b. LaRoche argues that generally known principles of chemistry taught, by 1989, that HCFC–141b would react with chlorine in much the same way as other prior art compounds, and that it was predicable that the photochlorination reaction would be selective for unsaturated compounds like VDC.

LaRoche contends that it was generally known that the presence of a double bond in unsaturated compounds allows them to react much faster with chlorine than do saturated compounds. A person of ordinary skill, LaRoche argues, would have readily predicted that a photochlorination process would be selective for unsaturated carbon compounds in the presence of HCFC–141b. Although published data were not available to determine exactly how selective the reaction with HCFC–141b would be, LaRoche contends, chemists of ordinary skill would have analogized the HCFC–141b reaction to other reactions of known selectivity.

It was known that the average reaction rate constant for chlorination of VDC is $K_{VDC} = 5 \times 10^{10}$ L/mol-sec. It was also known that the rate of chlorination of methyl chloroform, a compound structurally related to HCFC–141b, is $k_{methyl\ chloroform} = 9.66 \times 10^6$ L/mol-sec. These published data indicate that VDC reacts with chlorine approximately 6000 times faster than methyl chloroform will react with chlorine.

Dr. Pryor testified that methyl chloroform is closely related to HCFC–141b, with the only difference between the two being that the fluorine atom of HCFC–141b is replaced by a chlorine atom. Fluorine and chlorine atoms are both halogens, and exhibit similar chemical properties, he testified. He stated that a chemist of ordinary skill in the art would use methyl chloroform as a model for HCFC–141b, and would predict that the chlorination reaction of HCFC–141b would be at least as selective for VDC. He testified, moreover, that a chemist would predict that the HCFC–141b chlorination reaction would be more selective for VDC than would the chlorination reaction of methyl chloroform. According to Pryor, this is because the fluorine atom of HCFC–141b is more "electron-withdrawing" than the additional chlorine atom of methyl chloroform, which serves to diminish the electron density in the carbon-carbon bond, rendering the molecule less susceptible to consumption by chlorine.

The modeling data, he concluded, show that the addition of chlorine atoms to an unsaturated carbon compound will be much faster, typically by a factor of $10^4$ to $10^5$, than the substitution of chlorine atoms in HCFC–141b. This difference in relative reaction rates, he stated, demonstrates that a person of ordinary skill in the art would have expected VDC to be selectively reactive with chlorine, with little consumption of HCFC–141b.

#### b. *Elf Atochem's position*

Elf Atochem asserts that a person of ordinary skill would not be able to predict, based on general principles of chemistry, that the claimed process would work. Rather, Elf Atochem argues, a chemist would have had to engage in experimenta-

tion to determine that the process is useful.

Dolbier testified for Elf Atochem that the '479 patent, itself, discloses that the success of the chlorination reaction would have been unpredictable. Dolbier pointed to the experimental data presented in Table 1 of the patent, and noted that consumption of the HCFC–141b increased substantially when the temperature of the reaction was increased from 0°C to 21°C. This te mperature-sensitivity, Dolbier indicated, shows that the reaction is not predictable.

Dolbier also stated that the rate data cited by LaRoche would not have been accessible to one of ordinary skill in the art, because the data was contained in National Institute of Science books that were not widely available. Organic chemists, he testified, were not very interested in rate data at the time of the invention, in 1989, and would not have considered the data as part of their daily work.

Dolbier, commenting on Pryor's assertion that unsaturated compounds are more reactive with chlorine than are saturated compounds, stated that general principles are inadequate for predicting the outcome of competitive, selective reactions, like that disclosed by the '479 patent. Experimentation, he indicated, is necessary to know that the claimed process works.

Dolbier commented on Pryor's contention that methyl chloroform is a suitable model for HCFC–141b, and on his assertion that the published rate data indicate that the chlorination reaction should be at least as selective when using HCFC–141b. Dolbier refuted this position, noting that fluorine is a smaller atom than chlorine, and hence that HCFC–141b is a less bulky molecule than methyl chloroform. Because of this, he noted, HCFC–141b has fewer "steric effects" than methyl chloroform, and chemists would predict that it would undergo a chlorination reaction more readily than would methyl chloroform.

### 2. The Chapman '773 patent

#### a. LaRoche's position

The Chapman '773 patent, which issued in 1949, discloses a process for purification of HCFC–141b contaminated with VDC.[2] The patent teaches reacting the impure HCFC–141b mixture with chlorine. According to the patent, the chlorine reacts with VDC to form a compound that boils at a higher temperature, permitting the HCFC–141b to be distilled off. LaRoche states that the Chapman reference explicitly discloses all but one of the elements claimed in the '479 patent, in that it teaches a method for separating VDC from HCFC–141b by selectively reacting the VDC with chlorine, and using distillation as a separation means.

The patent does not expressly disclose the use of ultraviolet light to initiate the chlorination. LaRoche argues, however, that the use of light is implicit in the patent. Chlorination reactions, LaRoche contends, do not proceed without the use of either light or heat as an initiator. The patent discloses that the reaction takes place at 35°C, which is insufficiently hot to initiate the reaction. Thus, LaRoche argues, Chapman must have used light as an initiator.

#### b. Elf Atochem's position

Elf Atochem argues that the Chapman reference does not teach the claimed invention. Among the shortcomings of the reference, Elf Atochem contends, are that it does not disclose the use of ultraviolet light as an initiator; that it does not teach the "selective" conversion of unsaturated contaminants; and that it does not disclose that the reaction results in "no or small consumption" of HCFC–141b. Elf Atochem notes, moreover, that the European

---

**2.** The patent refers to 1, 1–dichloro–1–fluoroethane (HCFC–141b) as 1–fluoro–1,1–dichloroethane, and refers to vinylidene chloride (VDC) as asym-dichloroethylene. The parties do not dispute that these naming conventions are equivalent.

Patent Office issued the European counterpart of the '479 patent in light of the Chapman '773 patent.

### 2. The Coppens '085 patent

#### a. LaRoche's position

The Coppens '085 patent discloses a photochlorination process for separating an unsaturated carbon compound, trichloroethylene, from a saturated carbon compound, 1,2–dichloroethane. These two compounds cannot be readily separated by distillation because of their similar boiling points. The patent teaches that light is a useful initiator of the chlorination reaction. The patent further recites that the photochlorination reaction transforms the unsaturated trichloroethylene into a compound with a higher boiling point (pentachloroethane, $B_p$ 162°C), permitting the target compound, 1,2–dichloroethane, to be distilled off. The patent discusses the rates by which chlorine reacts with the two compounds. It states that "the speed of chlorination of trichloroethylene is about 120 times more rapid than that of 1,2,–dichloroethane" such that "the molar proportion of 1,2–dichloroethane chlorinated into 1, 1,2–trichloroethane is always relatively small with respect to the proportion of trichloroethylene chlorinated into pentachloroethane."

LaRoche contends that the Coppens patent discloses every element of the process claimed by the '479 patent, except that the starting material is a different saturated carbon compound: 1,2–dichloroethane instead of HCFC–141b. LaRoche points out that the patent explicitly teaches the use of a photochlorination reaction to selectively chlorinate an unsaturated compound, with virtually no chlorination of the saturated starting material. LaRoche notes that the Coppens patent uses distillation to separate the saturated starting material from the impurities once the chlorination reaction is complete.

#### b. Elf Atochem's position

LaRoche states that the Coppens patent is not specific to HCFC–141b. LaRoche notes that the PTO specifically considered the Coppens patent during the prosecution of the '479 patent. It contends that the Coppens patent does not suggest that the process disclosed is useful for purifying HCFC–141b.

Dolbier testified that the Coppens patent discloses a process "that would encourage, you know, a chemist to try a photochlorination for the separation of 141b."

### 4. The Prill patent

#### a. LaRoche's position

The Prill '044 patent discloses a process for producing HCFC–141b. The patent is directed to the use of a catalyst for preparing HCFC–141b from methyl chloroform, the same starting material used by Elf Atochem. The patent specification notes that VDC is produced as a by-product in the preparation of HCFC–141b. The specification discloses that to obtain a "pure sample" of HCFC–141b, a contaminated mixture of the compound is brominated, and the resulting solution is distilled. The patent discloses that, after the HCFC–141b is distilled off, a residue of 1,2 –dibromo–1,1–dichloroethane remains. Dr. Pryor states that a person of ordinary skill in the art would know that 1,2 – dibromo–1,1–dichloroethane is the product of the reaction between VDC and bromine.

LaRoche contends that the Prill '044 patent expressly discloses every element of claim 1 of the '479 patent except that Prill uses bromine as the halogenation agent instead of chlorine and the ultraviolet light initiator. Dr. Pryor testified that chlorine and bromine are very similar halogens, and that it was known in the art that compounds that could be brominated could be chlorinated, and vice versa. He concluded that a person of ordinary skill in the art would know that the reaction disclosed by Prill could be conducted by photochlorination in lieu of bromination.

### b. *Elf Atochem's position*

Elf Atochem contends that the bromination reaction disclosed by Prill does not suggest the use of a photochlorination reaction, as is claimed in the '479 patent. Dolbier testified that the halogens, although sharing certain characteristics, exhibit a wide degree of selectivity. Elf Atochem argues, moreover, that the Prill patent does not disclose the necessary reaction conditions, so it could not be determined whether the HCFC–141b would be consumed in the reaction.

### 5. *The Conover memorandum*

LaRoche has identified as prior art an internal memorandum of Elf Atochem's predecessor corporation, Pennwalt Corporation. The memorandum is dated July 19, 1980, was written by J.A. Conover, and is addressed to R.A. Gross. The memorandum identifies the problem addressed by the '479 patent-how to separate VDC and HCFC–141b. The memorandum reviews solutions to this problem suggested by the scientific literature. It mentions, as one possibility:

> e. React $CH_2=CCl_2$ [VDC] with chlorine in the absence of catalysts to form $Ch_2ClCCl_3$ (1,1,1,2–tetrachloroethane, I–130A) which boils at 130.20°C (Ref.3). Ref. 9 listed this possibility (from Ref. 8); the yields were 85–92 percent.

The "Reference 9" referred to in the memorandum is German Patent No. 530,649, which issued in 1931, and which discloses that the chlorination of VDC "can be carried out in the simplest manner under the influence of light."

LaRoche asserts that the Conover memorandum discloses every element of claim 1 of the '479 patent. Pryor stated that the Conover memorandum shows that a person of ordinary skill in the art would have expected that VDC could be selectively photochlorinated over HCFC–141b so that the compounds could be subsequently separated by distillation. The memorandum, LaRoche contends, states that such a result is "suggested in the literature."

### b. *Elf Atochem's position*

Elf Atochem asserts that the Conover memorandum is not prior art, because it is an internal memorandum, and not a publication.

Elf Atochem contends, moreover, that the Conover memorandum does not invalidate the '479 patent. It does not discuss, Elf Atochem notes, the use of light to initiate the photochlorination reaction, and it does not mention the selectivity of the reaction. The Conover memorandum, Elf Atochem insists, only discusses possible solutions to the separation problem, and does not say that these techniques would work.

### 6. *The evidence as a whole*

■ The question before the court is whether, when viewing the evidence presented as a whole, LaRoche has raised a "substantial question" as to validity. *Genentech, Inc.,* 108 F.3d at 1364. Conversely, the court looks to see whether Elf Atochem has shown that LaRoche's claim of invalidity "lacks substantial merit." *Id.*

### a. *Claim 1*

The court finds that LaRoche has raised a substantial question as to the validity of Claim 1 of the '479 patent. The evidence indicates that the elements of Claim 1 may have been disclosed by the prior art, and that a person of ordinary skill in the art might be motivated to combine the references.

The prior art has disclosed, since 1949, techniques for separating HCFC–141b from unsaturated carbon compounds such as VDC. Both the Chapman and Prill patents teach techniques for conducting this purification.

The prior art discusses using the technique of reacting impure HCFC–141b with chlorine to carry out the separation. The Chapman patent, for example, discloses the use of chlorine to treat HCFC–141b.

The prior art teaches the use of ultraviolet light to initiate chlorination reactions. Coppens teaches that ultraviolet light can be used to initiate chlorination reactions for separating unsaturated carbon compounds from saturated carbon compounds.

The prior art suggests that the chlorination reaction might be selective for VDC over HCFC–141b. Methyl chloroform is structurally related to HCFC–141b, and prior art data indicate that chlorine would react with VDC much faster than with methyl chloroform. It is plausible that if the reaction is highly selective, then there will be little or no consumption of HCFC–141b.

The prior art teaches that, once a halogenation reaction has been carried out, the HCFC–141b can be separated by distillation. Chapman discloses the use of a distillation technique.

The evidence presented at the hearing suggests that a person of ordinary skill in the art might combine these references. Dolbier testified that the Coppens patent would encourage a chemist to use photochlorination as a means to purify HCFC–141b.

The court has not yet made a determination of who a person of ordinary skill in the art is. Elf Atochem asserts that a person of ordinary skill in the art would be someone with a B.S. in Chemistry or Chemical Engineering, preferably having six months to a year experience in working with halogenated carbon compounds. This is a lower skill level than that urged by LaRoche. For the purposes of the preliminary injunction motion, even adopting the lower skill level proposed by Elf Atochem, the court finds that the evidence is sufficient to raise a "substantial question" as to the validity of Claim 1 of the '479 patent. *Genentech*, 108 F.3d at 1364. Elf Atochem has presented contrary evidence, but the court does not find that it is sufficient to show that LaRoche's position "lacks substantial merit." *Id.*

b. *Claims 2, 3, 6, 7, and 10*

Claim 2 limits Claim 1 by reciting that HCFC–141b is separated from the liquid mixture by distillation. LaRoche notes that the Coppens patent discloses the use of distillation as a means to separate HCFC–141b from the liquid mixture.

Claim 3 discloses a process according to Claim 2 wherein the pre-chlorination liquid mixture contains at least one halohydrocarbon with a lower boiling point than HCFC–141b, and the low-boiling halohydrocarbon is separated from the liquid mixture prior to chlorination. LaRoche notes that the Coppens patent discloses using two successive distillations, such that "light contaminants," such as ethyl chloride, may be eliminated in the first distillation.

Claims 6 and 7 disclose a process according to Claim 2 wherein the unsaturated carbon compound is treated with a molar excess of chlorine. Claim 6 recites the use of a molar ratio of up to three moles chlorine per mole of unsaturated carbon compounds, and Claim 7 recites the use of a molar ratio of up to 1.5 moles chlorine per mole of unsaturated carbon compounds. LaRoche states that the Coppens patent discloses treating a mixture with 1.4 moles of chlorine per mole of trichloroethylene, an unsaturated carbon compound.

Claim 10 discloses a process according to Claim 2 wherein the unsaturated carbon compounds subject to treatment include VDC. LaRoche notes that the Chapman and Prill patents disclose techniques for separating HCFC–141b from VDC.

LaRoche has identified prior art references that may be found to disclose elements of Claims 2, 3, 6, 7, and 10 of the '479 patent. The court finds that LaRoche has raised a substantial question as to the validity of these claims.

III. *CONCLUSION*

To prevail on its motion for a preliminary injunction, Elf Atochem must demon-

strate that it is likely to succeed on all disputed issues at trial. On the issue of nonobviousness, Elf Atochem has not shown that it has a sufficient likelihood of success on the merits to warrant the grant of a preliminary injunction. Since the court finds that Elf Atochem has not carried its burden with respect to nonobviousness, the court need not consider the remaining arguments raised by LaRoche. The court will enter an Order denying Elf Atochem's motion for a preliminary injunction.